**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

SELENA E MOLINA
SENIOR MAGISTRATE IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

January 12, 2026

M.R.
Dover, DE
(Via U.S. Mail)

Jennifer K. Ellsworth-Aults
Poole, Mensinger, Cutrona &
Ellsworth-Aults, LLP
2710 Centerville Road, Suite 101
Wilmington, DE 19808
(Via File and ServeXpress)

Alexandra S. McFassel, Esquire
Office of the Public Guardian
38 The Green, Suite 209
Dover DE 19901
(Via File and ServeXpress)

Re:  *IMO J.R.G.*, a person with a disability,
C.M. 2484-K-SEM

Dear Counsel & Interested Parties:

This longstanding guardianship has reached an impasse, which presents an opportunity for the Court to clarify its process and procedure for removal and replacement of delinquent guardians. Herein, I begin with a brief background of this action, then I explain the law and process for removing and replacing guardians, and, finally, I turn to the unique circumstances of this case.

Ultimately, I conclude that the guardian must be removed for good cause shown. Because there are no suitable replacements and there are less restrictive alternatives available, this guardianship should be administratively terminated.

There is, however, one final requirement (an affidavit) that needs to be filed before termination. The attorney *ad litem* shall work with the guardian to complete that requirement. Once the required affidavit is filed, this guardianship can be terminated.

## I.    Background

The guardian, M.R. (the "Guardian"), was appointed guardian of the person and property of J.R.G., her son, on November 17, 2006. The Guardian's appointment was plenary, and she was charged with making decisions for J.R.G. that are in his best interest, making sure that he is receiving appropriate medical care and treatment, that his personal needs are generally being met, and that any assets or income he receives are spent only in his best interest and for his needs.

The only reporting requirement imposed upon the Guardian was to file an annual update and medical statement with the Court. Given the nature of J.R.G.'s assets, the Guardian was not required to set up a guardianship bank account or file an inventory or accountings. Thus, absent any complications or material changes, the Guardian's only interaction with this Court should have been her annual update, which was due by October 1st of every year.

Unfortunately, the Guardian failed to comply with this simple—yet essential—requirement. This guardianship was plagued by years of missed deadlines, which prompted numerous reminders from court staff and courtesy extensions. Ultimately, the court was forced to issue five rules to the Guardian

requiring her to appear at hearings, explain why she failed to comply with her appointment order, and show cause why she should not be sanctioned appropriately.

The first rule to show cause hearing, scheduled for November 4, 2016, was cancelled when the Guardian filed her outstanding annual update.[1] The Guardian was a no-show at the second rule to show cause hearing in March 2018, but after the Guardianship Monitoring Program ("GMP") got involved, she filed her outstanding update later that year.[2] The Guardian again failed to appear at a February 2021 rule to show cause hearing; GMP was reappointed, and thereafter the Guardian filed her update.[3] But that 2021 update, filed on August 27, 2021, was the last time this Court has heard from the Guardian.

The Guardian missed her 2022, 2023, 2024, and 2025 deadlines.[4] She also missed two rule to show cause hearings.[5] And the GMP's magic has appeared to run out. The GMP was reappointed in November 2023, November 2024, and August 2025.[6] Unlike earlier appointments, the GMP's involvement did not compel the Guardian's compliance.

---

[1] Docket Item ("D.I.") 19.

[2] D.I. 25, 28.

[3] D.I. 33, 36.

[4] *See* D.I. 37–38, 42, 49.

[5] D.I. 41, 47.

[6] D.I. 42, 49, 53.

With the Guardian now non-responsive and recognizing other issues with the Guardian serving in a fiduciary capacity, the GMP questioned whether the guardianship should continue. In its most recent report, the GMP suggested that the Court administratively terminate this guardianship in favor of allowing the Guardian to operate as surrogate decisionmaker under Title 16 of the Delaware Code.[7]

As explained further below, the GMP's suggestion was well taken but did not reflect the full range of options. Thus, Magistrate Wright appointed an attorney *ad litem* for J.R.G. (the "AAL").[8] The AAL investigated the situation, and on October 27, 2025, filed a report recommending that the Court appoint the Office of the Public Guardian ("OPG") as successor guardian.[9] In her report, the AAL raised concerns about the Guardian's fitness to act as J.R.G.'s fiduciary and emphasized her conclusion that J.R.G. continued to need the protection of a guardianship.

After reviewing the AAL's recommendation, I wrote to OPG and invited a response.[10] I also indicated my inclination, at that time, to have an in-person hearing to further discuss the issue. OPG filed two responses. On December 2, 2025, OPG submitted a letter providing its position that guardianship was not the least restrictive means available to protect J.R.G. and that the Court should look to less restrictive

---

[7] D.I. 54.

[8] D.I. 55.

[9] D.I. 56.

[10] D.I. 58.

measures before considering appointment of OPG.[11] OPG echoed GMP's recommendations for administrative termination, emphasizing its current caseload and the difficulties OPG has serving individuals in the community. OPG then wrote again on December 5, 2025, advocating that the Court should require clear and convincing evidence that appointment of OPG is the least restrictive means to protect J.R.G. before considering an appointment of OPG as last resort.[12]

Upon review of the docket, I determined that a hearing was not necessary and am issuing this letter ruling in lieu thereof.

## II.    Legal Standards

As explained above, the Guardian in this case should be removed and the guardianship should be terminated once the required affidavit is filed. To reach that holding, I carefully considered Delaware's guardianship law and the Court's processes and procedures. I run through that first before turning to the case at hand.

### A. Guardianships Generally

As aptly explained by Vice Chancellor Glasscock: "Outside of the criminal arena, imposition of a guardianship represents the most significant deprivation of the right to self-determination a court can impose."[13] Thus, the Court does not take the

---

[11] D.I. 61.

[12] D.I. 62.

[13] *In re J.T.M.*, 2014 WL 7455749, at *1 (Del. Ch. Dec. 31, 2014).

prospect of appointing a guardian lightly. There are several requirements, hurdles, and checkpoints.

Initially, the petitioner seeking guardianship must file with the petition for guardianship a notarized physician's affidavit, completed within the last three months, with sufficient detail to make a *prima facie* showing that the person with an alleged disability has a disability under Delaware law.[14] The Court's website has the required physician's affidavit form and examples of sufficient and insufficient physician's affidavits.

Then, only if the physician's affidavit is sufficient will the Court's Magistrate Judges approve a preliminary order appointing an attorney *ad litem*, scheduling a hearing, and setting notice and service requirements.[15] After the attorney *ad litem*'s investigation and report and adequate notice to all interested parties, the Court hears the petition on its merits and determines whether to appoint the proposed guardian.

---

[14] An adult with a disability is one who "[b]y reason of mental or physical incapacity is unable properly to manage or care for their own person or property, or both, and, in consequence thereof, is in danger of dissipating or losing such property or of becoming the victim of designing persons or, in the case where a guardian of the person is sought, such person is in danger of substantially endangering person's own health, or of becoming subject to abuse by other persons or of becoming the victim of designing persons." 12 *Del. C.* § 3901(a)(2).

[15] Delaware's statutory scheme does provide for emergency, interim appointments; when the person with an alleged disability "is in danger of incurring imminent serious physical harm or substantial economic loss or expense the Court may without notice and hearing appoint an interim guardian of the person or property to serve for a period of up to 30 days[.]" 12 *Del. C.* § 3901(d)(1).

The burden for that stage remains with the petitioner, who must demonstrate incapacity by clear and convincing evidence.[16] "Clear and convincing evidence is evidence that produces an abiding conviction that the truth of the contention is highly probable."[17] In the guardianship context that requires evidence not just of incapacity but also that guardianship is the least restrictive measure to protect the person with a disability.[18] The Court has consistently emphasized that a petition for guardianship should only be filed as a last resort, where less restrictive options like advance healthcare directives, powers of attorney, or surrogate or supportive decision making are unavailable or insufficient to provide the level of support needed.

If a petitioner meets their requirements and overcomes these hurdles, a guardian will be appointed and the Court will set checkpoints, allowing it to monitor the guardian's service. Specifically, the Court has annual reporting requirements for all guardians, ensuring that the need for guardianship and the guardian's fitness to continue servings is reassessed every year.[19] For example, the Court's annual update and medical statement form requires the guardian to disclose various information

---

[16] *In re J.T.M.*, 2014 WL 7455749, at *3 ("[I]mposition of a guardianship must be supported by evidence that is clear and convincing, and not merely by a preponderance of the evidence.").

[17] *In re Martin*, 105 A.3d 967, 975 (Del. 2014) (citations omitted).

[18] This evidentiary showing can be met "on the papers," without an evidentiary hearing, in certain circumstances.

[19] This is in addition to other reporting requirements addressed more below.

including: (1) all updated contact information; (2) any difficulty visiting or communicating with the person with a disability or accessing services, care, treatment, or benefits; (3) any changes in the person with a disability's physical and mental condition; (4) any governmental or non-profit agencies providing services, care, treatment or other support to the person with a disability; and (5) who would be best suited to serve as additional or successor guardian, if needed. The medical statement portion of this annual reporting form then requires a report from a medical provider on the person with a disability's disability, diagnoses, procedures, and continued medical need for guardianship.

All guardians are required to file the annual update and medical statement. The Court reviews those forms, annually assessing the continued need for guardianship and responding to any concerns raised. Altogether, these requirements, hurdles, and checkpoints allow the Court to meet its responsibilities as the ultimate fiduciary for the person with a disability.[20] The expectation is that the guardian will then serve in their court-appointed capacity until the guardianship is terminated. Under Court of Chancery Rule 180-C, "any interested party may file a petition alleging a sufficient reason why guardianship is no longer necessary and requesting its termination." Reasons why guardianship may no longer be necessary include the

---

[20] *In re Est. of Nastatos*, 2023 WL 8269833, at *1 (Del. Ch. Nov. 30, 2023) ("In the guardianship context, the Court acts as ultimate fiduciary for the person with a disability[.]").

person with a disability's death, recovery, or ability to achieve the support necessary through less restrictive alternatives to guardianship.[21]

## B. Reasons for Removing Guardians

A guardian may, however, need to be removed before a guardianship is terminated. Under 12 *Del. C.* § 3908, the Court "may remove a guardian for any sufficient cause." This authority allows the Court to respond to changing circumstances and ensure that the needs of the person with a disability can continue to be met. The need to remove and replace a guardian arises in four ways, with the current guardian's (1) delinquency, (2) resignation, (3) death, or (4) misconduct. I will walk briefly through these avenues before turning to the removal analysis.

1. **Delinquency.** Court-appointed guardians have various obligations and deadlines they must follow. Every guardian is required to file an annual update and medical statement. Most guardians of property are required to file a proof of compliance with their banking requirements, an inventory, and annual accountings. And guardians of the person may be required to file care plans, visitation plans, or other healthcare related updates and documents. Any deadline imposed is reflected in an order from a Magistrate Judge and, if the

---

[21] *See* Ct. Ch. R. 180-C.

guardian is self-represented, explained to the guardian personally during a hearing. The Register in Chancery tracks guardians' deadlines and will, typically, send delinquency letters when deadlines are missed. When the guardian fails to respond and cure the delinquency, the Court may need to consider removing and replacing the guardian.

2. **Resignation.** Court-appointed guardians are not permitted to unilaterally resign from their position. Guardians may, however, request to resign, essentially requesting their removal. They may do so in one of two ways: (1) by filing a petition for their removal and replacement, with the consent of a qualified successor guardian(s) or (2) through letter request explaining their interest in, or need to, resign and the unsuccessful efforts they made to locate a successor guardian. The Court may then need to remove and replace the guardian.

3. **Death.** If a court-appointed guardian dies during their appointment, the Court will need to remove them and appoint a successor. Other than final accounting requirements imposed on the administrator of the guardian's estate (12 *Del. C.* §§ 1510, 3941), the guardian's duties and authority do not automatically transfer to their estate,

successors, or heirs, and, rather, die with them, requiring the Court to get a new fiduciary in place expeditiously.

4. **Misconduct.** Finally, the Court, unfortunately, must remove guardians who have breached their duties, misappropriated the person with a disability's assets, or otherwise engaged in misconduct.

## C. Process for Removing Guardians

When a guardianship becomes complicated by a guardian's delinquency, request to resign, death, or misconduct, the Court has several guiding principles and tools. The Court's primary focus is keenly on the person with a disability; ensuring they remain protected under the guardianship. But the Court is also careful to give the guardian and other interested parties adequate notice of the circumstances and the opportunity to be heard in connection with any changes. These twin interests are pursued through several avenues: (1) rule to show cause hearings, (2) appointment of the GMP, (3) appointment of an attorney *ad litem*, and (4) direct inquiries to interested parties.

1. **Rules to Show Cause.** The Court will issue rules to delinquent and misbehaving guardians, directing them to appear at a hearing, explain their conduct, and show cause why they should not be sanctioned appropriately, up to and including removal.

2. **Appointment of the GMP.** The GMP operates within the OPG and is responsible for monitoring the Court's guardianship docket.[22] This responsibility has two prongs: (1) routine audits of active cases and (2) review and investigation when specifically appointed by the Court. But, in addition to these Court-related duties, GMP handles responsibilities assigned by OPG, including direct case work for cases in which OPG serves as guardian. GMP providing this direct work helps with OPG's growing caseload, which OPG represents is currently over 60 cases per case manager.[23] GMP's position within OPG and involvement in case work does, however, create the appearance of, and potential for, a conflict of interest if GMP is appointed to a case where OPG may be the guardian of last resort. Nonetheless, GMP will be appointed by the Court when appropriate to investigate and file a report with recommendations. Following the report and recommendation, the Court may adopt the order or schedule further proceedings.

3. **Appointment of an attorney *ad litem*.** The Court appoints attorneys *ad litem* for persons with alleged disabilities as a matter of

---

[22] Ct. Ch. R. 180-D(a).

[23] D.I. 61.

course.[24] But, once a guardianship is established, the attorney *ad litem* is typically discharged. When issues arise with the guardian, the Court may reappoint an attorney *ad litem* to represent the person with a disability in connection with those issues and provide recommendations to the Court. Like with the GMP, following the report and recommendation, the Court may adopt the order or schedule further proceedings.

4. **Direct Inquiries.** When guardians pass, the Court will directly contact interested parties about successor guardianship. As explained above, the guardian is required to identify potential successor guardians in each annual update. The Court then uses that information and the larger interested party list to attempt to secure a successor guardian.

The Magistrate Judges act with discretion, choosing the avenue best suited to the unique circumstances at hand.

## D. Determining a Successor Guardian

If, after going down the most appropriate avenue, the Court must appoint a successor guardian, there is a statutorily supported priority scheme. First, the Court

---

[24] *See* Ct. Ch. R. 176.

looks to the person with a disability's next of kin or chosen family. If there is no one (or those individuals are unwilling, unable, or unqualified to serve), the Court will go to option two: a professional guardian. The Court has a process to vet, approve, and oversee professional guardians; only approved and compliant professional guardians will be appointed in that capacity. One important difference between private and professional guardians is that the latter bill for their time and submit fee requests which, if approved by the Court, are paid from the person with a disability's funds. These fees render professional guardians ill-suited for guardianships with minimal assets or income.

The final option, if there are no individual or professional guardians able to serve, is the Office of the Public Guardian. Under 12 *Del. C.* § 3983(4), the Office of the Public Guardian, "[w]hen appointed as guardian by court order, shall serve as guardian of last resort, either plenary or limited; temporary guardian; or successor guardian; of the person or property, or both, of persons who are determined to be incapacitated for reasons other than minority." "Last resort" includes:

> a. [c]ircumstances in which there is no other suitable person willing or able to serve as surrogate decision maker, guardian, representative payee, or VA fiduciary[;] b. [c]ircumstances in which a person willing or able to serve, or already serving, as a validly appointed agent of a durable power of attorney, a surrogate decision maker, representative payee, VA fiduciary, or a guardian, is available but sufficient cause has been found by the court that the individual available or so acting is not suitable to serve and that the appointment of the Public Guardian is in the best interest of the person who is incapacitated[;] and c. [e]xceptional circumstances . . . found by the court to establish that

appointment of the Public Guardian is in the best interest of the person who is incapacitated.[25]

In its letter submissions, OPG advocates for an even more heightened bar before its appointment as guardian of last resort. In doing so, OPG conflates the successor appointment process with the initial appointment process. Those are materially different. When the Court needs to appoint a successor guardian, it is doing so because it has already determined that there is clear and convincing evidence of incapacity, and that guardianship is necessary. OPG's argument that there are due process implications in replacing that guardian without another showing of such incapacity and necessity is misplaced and unpersuasive. Once the Court has determined that a guardian should be appointed, the question of replacing that guardian does not require re-litigation of the need therefor. Again, the question depends on the priority scheme, looking to who is available and best suited to serve. When that scheme leads to OPG, the "last resort" statutory definition controls. With clear guidelines already in place in Delaware, OPG's appeal to outside authorities is unpersuasive.

## III. Application

Here, I have no difficulty concluding that the Guardian should be removed. But, working through the replacement priority scheme, I find I do not have a

---

[25] 12 *Del. C.* § 3982(4).

successor guardian to appoint. Family and friends have gone silent, there are insufficient funds to pay a professional guardian, and this case falls outside the "last resort" category because there are less restrictive alternatives. With that finding, I will, *sua sponte*, work to terminate the guardianship in favor of less restrictive alternatives. That requires more from the AAL and the Guardian as explained herein.

## A. The Guardian should be removed, but there is no available replacement.

As explained above, there are two separate avenues for termination and removal. Here, I begin in the removal scheme and must start with the good cause standard for removing the Guardian. The Guardian's years-long delinquency is sufficient good cause for her removal.[26]

That brings me to replacement and the priority scheme. Despite notice and opportunity to do so, J.R.G.'s family and friends have failed to step up and request their appointment as successor fiduciaries. Option one is, thus, unavailable. Then we have option two: a professional guardian. J.R.G.'s assets and income are not, however, sufficient to support the fees of a professional guardian while still meeting his needs. It would not be in his best interest to impose that financial responsibility upon him. That means, as the AAL recognized, the only successor option is OPG.

---

[26] *See In re J.H.C.*, 2025 WL 819864, at *4 (Del. Ch. Feb. 21, 2025).

Appointment of OPG requires more, however, than a finding that other options are unavailable. OPG must truly be the "last resort" as that is defined by statute. Here, it is not. There is, as reflected in the reports from the GMP and AAL, an alternative to OPG. The Guardian is willing and able to serve as surrogate decision maker. The primary question, and the concern raised by the AAL is whether she is "suitable" as required in Title 12.

What renders someone "suitable" is not defined in the statutory scheme nor elsewhere in Title 12. I must, nonetheless, "attempt to ascertain and give effect to the General Assembly's intent[,]" by construing such undefined term according to its common and approved usage.[27] For that I look to a few places: (1) other sections within Title 12, (2) Delaware case law, and (3) Black's Law Dictionary.

The concept of a "suitable person" exists within various other sections in Title 12. Most tellingly, it appears in Section 3983, which sets forth the duties of the Public Guardian, and provides that OPG may "[m]ake a recommendation as to a suitable individual who is available and willing to serve as guardian or default surrogate decision maker[.]"[28] Again, what may make someone suitable, or not, is

---

[27] *DeMatteis v. RiseDelaware Inc.*, 315 A.3d 499, 513 (Del. 2024).

[28] Other sections in Title 12 require suitability. For example, in Section 4102, the Register of Wills is authorized to "appoint any suitable person as conservator[.]" Likewise, in Section 1709, this Court may "appoint a suitable person or corporation as trustee" in connection with distributing the assets of the estate of a presumed decedent.

not defined, but the plain language of this section appears to give some level of credence to OPG's expertise and discretion in determining suitability.

Delaware case law reflects that suitability is context specific. For example, in *Bailey v. Bailey*, the Court was called upon to interpret a will which authorized the appointment of "a suitable person" as trustee.[29] This Court determined that suitability needed to be interpreted through considering "the object and design of the testator . . . and also the reason why the power of appointing a trustee was conferred" on the individual.[30] In *Bailey*, the suitability limiter was meant to protect and preserve the trust assets from the testator's son, who had outstanding debts. The testator gave his son a limited power of appointment, requiring that he only appoint someone "suitable." The testator's son sought to exercise his power to appoint his own son, then a young man who did not own any significant property and was, to some extent, dependent on and beholden to his father. The Court concluded that person was not suitable, because his appointment would not achieve the goal of protecting and preserving the trust outside the testator's son's influence.

In the guardianship context, a good cause removal of a guardian may mean the guardian is also not suitable to support the person with a disability. For example, in *In re B.W.*, then-Master Glasscock removed a guardian and, implicitly, found her

---

[29] *Bailey v. Bailey*, 1843 WL 854, at *3 (Del. Ch. Sept. 1, 1843).

[30] *Id.*

not suitable, requiring the appointment of OPG.[31] Therein, the guardian had threatened the person with a disability's primary care physician, refused to allow the person with a disability to receive medication, refused recommended testing, and refused to consent to other treatment. The guardian did not deny this conduct, but gave various explanations and excuses, which then-Master Glasscock found "not rational in light of the facts."[32] Although acknowledging the guardian's love for the person with a disability, then-Master Glasscock removed her and appointed OPG as successor, implicitly finding the guardian not suitable and inviting OPG to propose "a suitable family member" should it discover one.[33]

That brings me, finally, to Black's Law Dictionary. Delaware courts "regularly refers to dictionaries in defining code terms."[34] Black's Law Dictionary defines suitable as "fit and appropriate for their intended purpose."[35]

Here, the Guardian is suitable. The suitability requirement in 12 *Del. C.* § 3982(4) is a protective device. It ensures that vulnerable Delawareans are not left without a "last resort" option if, for example, the only other persons willing to serve as surrogate, guardian, representative payee, or VA fiduciary, are not suitable or fit

---

[31] *In re B.W.*, 2011 WL 2448373, at *1 (Del. Ch. June 3, 2011).

[32] *Id.* at *4.

[33] *Id.* at *5.

[34] *DeMatteis*, 315 A.3d at 513.

[35] *Suitable*, BLACK'S LAW DICTIONARY (12th ed. 2024).

to so serve the person with a disability. This requires more than just the existence of a willing family member; the Court must determine that they are suitable.

A removed guardian may, however, still be "suitable." By removing the Guardian, however, I did not effectively declare her not suitable. Unlike the guardian in *In Re B.W.*, the guardian here was removed for delinquencies, not misconduct. Guardians who fail to meet court deadlines are delinquent and unfitting for continued service as court-appointed fiduciaries but not, necessarily, for service outside the judicial context.

The question is, thus, whether the guardian is suitable (fit and appropriate) to serve as default surrogate decision maker. Suitability, thus, looks to whether the guardian qualifies as a default surrogate under Title 16.

Under 16 Del. C. § 2512, "[a] default surrogate may make a health-care decision for an individual who lacks capacity to make health-care decisions and for whom an agent, or guardian authorized to make health-care decisions, has not been appointed or is not reasonably available."[36] A default surrogate is, however, disqualified from acting as default surrogate if any of the following apply:

> (1) A court finds that the potential default surrogate poses a danger to the individual's well-being, even if the court does not issue a protection from abuse order against the potential default surrogate.
> (2) The potential default surrogate is an owner, operator, employee, or contractor of a nursing home or long-term care facility in which the

---

[36] 16 *Del. C.* § 2512(a).

individual is residing or receiving care unless the owner, operator, employee, or contractor is a family member of the individual, the cohabitant of the individual, or a descendant of the cohabitant.

(3) The potential default surrogate refuses to provide a timely declaration under § 2512(c) of [Title 16].

(4) The individual has a pending protection from abuse petition against the potential default surrogate.

(5) The individual has a protection from abuse order against the potential default surrogate.

(6) The potential default surrogate is the subject of a civil or criminal order prohibiting or limiting contact with the individual.[37]

Here, there is no dispute that the Guardian, as J.R.G.'s mother, is his default under the statutory priority scheme.[38] And there is no basis on which to declare her disqualified from acting as default. Subparts (2)-(6) simply do not apply and there is nothing in the record before me that would support a finding that the Guardian poses a danger to J.R.G.'s well-being under (1). Both the GMP and AAL investigations uncovered that the Guardian, J.R.G.'s mother, continues to assist him in the community and is familiar with his needs and has some amount of support in place. Although she has been unresponsive throughout this guardianship and has what could be termed a checkered record, neither disqualify her from serving as default surrogate. She is, thus, a "suitable person willing or able to serve as surrogate decision maker," which leaves me unable to appoint OPG as guardian of last resort.

**B. This guardianship should be administratively terminated.**

---

[37] 16 *Del. C.* § 2514(b).

[38] 16 *Del. C.* § 2512(b).

Because I have concluded that there is good cause to remove the Guardian, but no available successor, I must consider termination. To be clear, this Court will not terminate a guardianship solely because a guardian wants or needs to be removed, and replacement proves difficult. When this Court appoints a guardian, it takes jurisdiction over the person with a disability and serves as ultimate fiduciary. It will not abdicate that responsibility when things get tough. Delaware law commands as much, and the statutory scheme for appointment of OPG as last resort is a powerful tool; OPG is an essential state agency which serves as guardian when guardianship is necessary but there is not an available guardian in the community.

Here, however, there is protection available short of guardianship. Thus, under Court of Chancery Rule 180-C, I must consider termination in favor of less restrictive alternatives. Rule 180-C(b)(2) provides:

> If the Court finds that guardianship is no longer necessary due to availability of other measures and such measures are in the best interest of the person with a disability, the matter may be administratively closed without prejudice. An affidavit shall be filed with the Court specifying the means of substitute decision making to be used, and the consent of the individual responsible for utilizing it.

For the reasons explained above, I find guardianship is no longer necessary due to the availability of other measures. I further find those measures are in J.R.G.'s best interest. From the GMP and AAL, I have learned that J.R.G. is doing relatively well, despite the deficiencies in this guardianship action. Imposing more restrictions or a new decisionmaker on him would not be in his best interest; he is best served through

maintenance of the *status quo*. Before I can terminate, however, I need "[a]n affidavit . . . specifying the means of substitute decision making to be used, and the consent of the individual responsible for utilizing it." That requirement is mandatory, given the "shall" qualifier.

## IV.    Conclusion

As explained herein, I find the Guardian should be removed but the priority scheme does not lead to an available successor to appoint. Administrative termination, thus, appears appropriate, but the Guardian has not filed the required affidavit. The Guardian has 30 days to execute and file the required affidavit. The AAL shall assist the Guardian in this exercise and shall submit a report within 30 days on such efforts. If the Guardian fails to file the required affidavit, I will need to reconsider whether she remains a "suitable person" for purposes of the last resort analysis. This is a report under Court of Chancery Rule 144, but exceptions are stayed pending the above submissions and a final ruling on replacement or termination.

Respectfully,

*/s/ Selena E. Molina*
Senior Magistrate Judge

cc:    M.R. (via U.S. Mail)
       F.R. (via U.S. Mail)